IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:13-CV-00232-D

| | | |
|---|---|---|
| FRANKLIN E. HASTY, | ) | |
| | ) | |
| Plaintiff/Claimant, | ) | |
| | ) | |
| | ) | **MEMORANDUM AND** |
| v. | ) | **RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-20, DE-23] pursuant to Fed. R. Civ. P. 12(c). Claimant Franklin E. Hasty ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of his applications for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be allowed, Defendant's Motion for Judgment on the Pleadings be denied, and the case be remanded to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on March 28, 2008, alleging disability beginning May 25, 1999.[1] (R. 17, 174-77). His claim was denied initially

---

[1] While Claimant initially sought Supplemental Social Security Income payments (R. 170-73), those claims were denied initially (R. 63-68), and Claimant's Request for Reconsideration only sought review of the denial of his application for DIB (R. 75).

and upon reconsideration. (R. 17, 69-72, 76-78). A hearing before Administrative Law Judge Linda R. Haack ("ALJ") was held on January 20, 2010, at which Claimant was represented by counsel and a vocational expert ("VE") appeared and testified. (R. 32-56). At the hearing, Claimant amended the alleged date of onset to January 1, 2003. (R. 17, 36). On February 12, 2010, the ALJ issued a decision denying Claimant's request for benefits. (R. 14-31). On August 28, 2013, the Appeals Council denied Claimant's request for review. (R. 1-4). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial

2

evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520, under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant alleges that the ALJ's RFC determination is not supported by

3

substantial evidence for two reasons: (1) because the ALJ erred by failing to consider post-date last insured ("DLI") evidence which reflected back upon Claimant's condition during the relevant time period, and (2) because the ALJ improperly evaluated Claimant's credibility regarding his low back pain and resulting limitations. Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") [DE-21] at 7-9.

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 19). Next, the ALJ determined Claimant had the following severe impairments: back pain, myasthenia gravis, and arthralgias. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform somewhere between the range of light and medium work,[2] specifically that Claimant could sit, stand and walk for six hours in an eight hour day with normal breaks, lift a

---

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, he can also do sedentary and light work. 20 C.F.R. § 404.1567(c).

4

maximum of 35 pounds, lift 20 pounds occasionally (up to one third of the work day), and lift ten pounds frequently (up to two thirds of the work day). (R. 20). The ALJ determined that Claimant could perform postural activities occasionally, but with the following physical limitations: avoiding ladders, ropes, scaffolds, hazards, rapid movements, and twisting of his trunk. *Id.* The ALJ also identified the following non-exertional limitations: avoiding jobs requiring fine vision such as watching figures or dealing with very small objects and jobs requiring persistent talking. *Id.* In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 20-25). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work as a highway patrol officer. (R. 25). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 26-27).

**B.     Claimant's Testimony at the Administrative Hearing**

At the time of Claimant's administrative hearing, Claimant was 55 years old and unemployed, living with his wife of 35 years. (R. 37-38). Claimant is a high school graduate and completed some college coursework. (R. 37). Claimant was previously employed with the State of North Carolina as a highway patrol officer and his last day of work was on May 25, 1999, when he was injured while training on the firing range. (R. 38). Claimant is right-handed, can read a newspaper and write a letter, and can add and subtract. (R. 37-38).

Claimant amended his onset date to January 1, 2003, and testified that he was unable to work as of that date due to pain and trouble controlling his legs. (R. 38-39). At that point, Claimant had trouble walking, sitting, and standing for long periods of time, and could not drive. (R. 38).

5

Claimant could not lay still and had problems sleeping, and testified that he "constantly had to be on the move to stay out of pain." *Id.* At the hearing, Claimant had trouble sitting up straight and testified that he was in a "great deal of pain." *Id.* Claimant is unable to sit directly on his tailbone, and has not been able to do so since his accident in 1999. (R. 46). During the hearing, Claimant was sitting "laid back and on one hip." *Id.*

Because of Claimant's myasthenia gravis, he has eye problems and is unable to wear glasses due to his eye muscles not adjusting correctly. (R. 42-43). Claimant began having trouble with his eyes in the middle of 2004, but he testified that it took his doctors a long time to correctly diagnose the issue. (R. 44). Additionally, Claimant's myasthenia gravis causes weakness in his hands every few days, and Claimant also has issues regulating his temperature, which he believes may be caused by the myasthenia gravis. (R. 43). Claimant testified that his eye problems were the same near December 31, 2007 (hereafter referred to as Claimant's "DLI"), as they were when he was diagnosed in 2004. (R. 44). Further, Claimant testified that his myasthenia gravis has not gotten any better and that he still has trouble focusing at a distance. *Id.* Currently, however, Claimant is no longer seeing double and his eyes are now able to both focus on the same object. *Id.*

Claimant testified that he can sit for ten minutes at a time, stand for five or ten minutes, and walk 50 to 100 feet. (R. 43). Claimant drove himself to the hearing, and on average drives 15 miles each week. (R. 36). While driving to the hearing, Claimant had to stop three times. (R. 47). Claimant testified that prior to his DLI, if he drove the same distance, he also would have had to stop three times to get out and walk around. *Id.* Usually, if Claimant's daughter is working, he will drive to pick up his grandchild from school a couple of days a week. (R. 36). Claimant is able to get along with people, but has been accused of being short tempered because of his pain. (R. 43).

6

Claimant testified that he can understand and follow instructions, but he gets confused sometimes due to his medications. *Id.*

After Claimant's accident, he had back surgery for the first time in 1999. (R. 45). Claimant then had a second back surgery in 2001 with Dr. Lestini, who was Claimant's Worker's Compensation doctor. (R. 45, 323-44). Since Claimant's second back surgery, his back problems have not improved. *Id.* Claimant had a third back surgery in January of 2009. (R. 45-46). Claimant testified that when he had the back surgery in January of 2009, it was because his back was the same as it had been prior to his DLI. (R. 46). Since his third back surgery, Claimant testified that his back pain has not improved. *Id.* Claimant did state that his leg does not give out since the third back surgery, but he is still in a "great deal of pain and the pain has moved into [his] hips now from mostly in the center of [his] back." (R. 42).

Claimant testified that both prior to his DLI and currently, he can bend some but cannot do anything involving torsion. (R. 47). For example, Claimant is currently unable to bend over and pick up a gallon of milk from the floor and could not do so before his DLI. (R. 47-48). If Claimant tried to bend over and pick something up before his DLI, he would not have been able to bend fully over due to stabbing pain in his legs and back. (R. 48). Claimant testified that if he bent or twisted the wrong way, he would set off his back and be laid up in bed for two days because of his back pain. *Id.* Claimant also testified that the same thing happens currently. *Id.* Prior to his DLI, Claimant testified that he would have these episodes of being laid up in bed for two days at least once a week, and most of the time more often than that. *Id.*

Before Claimant's DLI, he was only able to sit on his couch, but at some point after 2007, Claimant became able to sit in his recliner because he made himself move around more. (R. 49).

7

Even when sitting in the recliner, Claimant cannot sit on his tailbone and has to lie back and sit side to side. (R. 52). Claimant testified that he has no comfortable sitting positions, and that this was also the case before his DLI. (R. 52-53). Claimant testified that he has had no relief from his back surgeries, and his back pain is as bad currently as it was before his DLI. (R. 49-50). Claimant has taken pain medication since his accident in 1999 and testified to having side effects from that medication, which he also experienced before his DLI. (R. 50). These side effects include confusion and two episodes of stomach pain. *Id.* Claimant testified that he has to write down anything he plans to do, because his confusion makes it difficult to follow directions. *Id.*

Claimant testified that his daily activities have not changed between the time prior to his DLI and the date of the hearing. (R. 50-51). On a normal day, Claimant testified that he sits either in his recliner or on the couch, reads the papers, watches television, does crossword puzzles, and watches his grandchildren play. (R. 51). Claimant sometimes tries to do yard work, but is not able to ride the lawnmower for more than ten to fifteen minutes without aggravating his back problems, leading to him being on bed rest. (R. 51-52). Claimant does not engage in many social activities, but did attend the Christmas party for state troopers. (R. 52). Claimant's wife does the cooking, laundry, and grocery shopping for their household. *Id.* Even though Claimant thinks he probably could go to church, he testified that he does not attend. *Id.*

## C. Vocational Expert's Testimony at the Administrative Hearing

Feryal Jubran testified as a VE at the administrative hearing. (R. 53-56). After the VE's testimony regarding Claimant's past work experience, the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant (R. 54-55). Then the ALJ asked the VE to identify jobs the hypothetical individual could perform, assuming the

8

following limitations: the individual can sit, stand, and walk six hours in an eight hour day with normal breaks, can perform postural activities occasionally but needs to avoid ropes, ladders, scaffolds, hazards, rapid movements, and twisting of the trunk, can lift a maximum of 35 pounds, can lift 20 pounds occasionally (up to one-third of the workday), and can lift 10 pounds frequently (up to two-thirds of the workday). *Id.* The individual also needs to avoid jobs requiring fine vision (such as watching figures or small objects) and jobs requiring persistent talking. *Id.* The VE identified three jobs that this hypothetical individual could perform: (1) machine tender (DOT #556.685-038, SVP-2, light, unskilled), (2) router (DOT # 222.687-022, SVP-2, light, unskilled), and (3) cloth folder, DOT # 589.687-010, SVP-2, light, unskilled). (R. 55-56).

In response to questioning from Claimant's attorney about the amount of time a person could be absent from work for those three jobs and continue to be employed, the VE stated that an employee could be absent for 12 days each year. (R. 56). Claimant's attorney asked whether a person would be disqualified from holding those positions if he had to miss up to two days a week from work, and the VE responded in the affirmative. *Id.*

## V. DISCUSSION

### A. The ALJ's Consideration of Post-DLI Medical Evidence

Claimant contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ erred by failing to consider post-DLI evidence that is reflective of Claimant's condition during the relevant time period. Pl.'s Mem. at 7-8. Specifically, Claimant alleges that the ALJ erred by not mentioning or considering Claimant's medical records from 2008 and 2009, including the medical records detailing Claimant's third back surgery in 2009. *Id.* at 7. Claimant alleges that this evidence is material, because Claimant complained of low back and right leg pain

9

during the relevant time period and underwent back surgery in 2009 to repair a pars defect in his spine–a structural spinal defect capable of causing his low back and right leg pain. *Id.* Further, Claimant alleges that the ALJ erred by giving controlling weight to Claimant's treating physician, Dr. Lestini, who opined in 2002-2003 that Claimant no longer had any structural spinal defects and could perform light work, when the post-DLI medical evidence reveals the existence of a structural spinal defect–a possible objective basis for Claimant's pain occuring after Dr. Lestini's opinion and during the relevant time period. *Id.* at 7-8. Defendant responds that the ALJ properly considered the post-DLI evidence of Claimant's back surgery, and that while Claimant's condition worsened after the DLI, this does not show that Claimant was disabled before his DLI. Def.'s Mem. Supp. Def.'s Mot. J. Pleadings ("Def.'s Mem.") [DE-24] at 7-9.

An individual's RFC is the capacity which an individual possesses despite the limitations caused by his physical or mental impairments. 20 C.F.R. § 404.1545(a)(1); *see also* S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC assessment is based on all relevant medical and other evidence in the record and may include a claimant's description of limitations arising from alleged symptoms. 20 C.F.R. § 404.1545(a)(3); *see also* S.S.R. 96-8p, 1996 WL 374184 at *5. "[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (citations omitted). The ALJ's RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." S.S.R. 96-8p, 1996 WL 374184, at *7.

When a claimant is seeking DIB, the law requires both a finding of disability and that the

10

claimed disability begin before the expiration of insurance coverage, or the DLI. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a); *Johnson v. Barnhart*, 434 F.3d 650, 655-56 (4th Cir. 2005). The ALJ is not required to consider evidence tending to show that the disability existed after the DLI where the objective medical evidence does not show that the impairment existed before the DLI. *Johnson*, 434 F.3d at 656. Post-DLI medical evidence is not automatically excluded, however, and may be relevant to prove a disability arising before the claimant's DLI. *Bird v. Comm'r of Social Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012); *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969). Where post-DLI medical evidence may be probative of a claimant's pre-DLI disability status, "the ALJ may not consider post-DLI records to be automatically irrelevant." *Abernathy v. Astrue*, No. 4:08-CV-99-FL, 2009 WL 1578533, at *2 (E.D.N.C. June 3, 2009) (adopting memorandum and recommendation holding that the ALJ erred by summarily dismissing post-DLI medical evidence as irrelevant simply because it arose after claimant's DLI); *see also Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987) (medical evaluations made two years subsequent to the DLI are not automatically barred from consideration and may be relevant to prove a previous disability). Remand is proper where it is unclear what weight, if any, the ALJ gave relevant medical evidence. *Id.* at *3 (citing *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987) (holding that ALJs must "explicitly indicate the weight given to all relevant evidence")). Just as the district court does not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]," it is further outside of the province of the district court "to engage in these exercises in the first instance." *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013) (internal citations and quotations omitted).

ALJs have a duty to weigh medical opinion evidence and explain the weight given to such

11

evidence. Generally, more weight is given to opinions of treating sources, as they are able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. 20 C.F.R. § 404.1527(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590. "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight. *Id.* Similarly, "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); *see Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

The ALJ in the instant case did not mention Claimant's post-DLI medical records from 2008 and 2009. (R. 19-27). At the beginning of Claimant's hearing, Claimant's attorney discussed with the ALJ two recently-filed exhibits to ensure that those exhibits had been added to the record: Exhibits 14 and 15, which are Claimant's medical records from April 2008 through November 2009. (R. 35). In response, the ALJ clarified that the Claimant's DLI was in December of 2007. *Id.* Further, during the ALJ's examination of Claimant, she warned Claimant to focus on his limitations prior to his DLI. (R. 42). Later in the hearing, however, Claimant testified about his third back surgery, which took place in 2009. (R. 45-46). Claimant also testified about how his back problems have not improved since his injury, and when he had the surgery in January 2009, it was because his back pain was still the same as it had been prior to his DLI. (R. 46).

The ALJ explicitly considered some evidence in the opinion that postdates Claimant's DLI. Specifically, the ALJ cites to two reports by Dr. William Frystak (one prepared in April 2008 (R. 23-

12

Case 7:13-cv-00232-D   Document 26   Filed 01/12/15   Page 12 of 16

24, 210) and a RFC assessment prepared in June 2008 (R. 24-25, 585-92)) and a case analysis performed by Dr. Pamela Jessup in July 2008 (R. 24-25, 593). However, Claimant specifically points to the evidence regarding his January 2009 back surgery in alleging that the ALJ erred by failing to consider post-DLI medical evidence. Pl.'s Mem. at 7-8. The hospital records pertaining to Claimant's back surgery cover the period ranging from October 2008 to April 2009 (R. 594-636), and the ALJ's opinion does not mention any post-DLI evidence from this time period after Dr. Frystak's and Dr. Jessup's opinions were rendered.

Claimant alleges that the pain stemming from his back injury has prevented him from working. (R. 38-39). Before Claimant's DLI, he had two back surgeries as a result of that injury. In June of 2000, Claimant had a posterior lateral fusion of L5 to S1. (R. 255-99). Then in July 2001, a MRI revealed degenerative changes in Claimant's spine at L4-L5 and L5-S1. (R. 350). Claimant then had a second surgery in August 2001 to perform an anterior interbody fusion at L5-S1. (R. 323-44). In February of 2002, Dr. Lestini (who performed Claimant's second surgery) opined that Claimant had reached maximum medical improvement and could work with a "permanent light/medium work restriction with no lifting over 35 pounds." (R. 359). Dr. Lestini's opinion was largely based on how well Claimant had recovered from the second surgery. (R. 356-59). Then in April 2003, Dr. Lestini again stated that Claimant was at maximum medical improvement and opined that Claimant had "chronic low back syndrome" but did not have a "structural lesion that is fixable at this point" and limited Claimant to a light work restriction. (R. 363). Ultimately, the ALJ gave controlling weight to Dr. Lestini's 2002 opinion that Claimant could not lift more than 35 pounds. (R. 25)

Dr. Lestini's 2002 opinion was rendered almost five years before Claimant's DLI. The ALJ

13

also discussed Claimant's treatment for his back pain during the time after he stopped seeing Dr. Lestini and the DLI. (R. 21-22). Much of that discussion focuses on Claimant's exams at the L3-L4, L4-L5, and L5-S1 levels–the site of Claimant's previous back surgeries and the surrounding discs. Specifically, the ALJ notes that in October 2002, Claimant had "a left-sided posterior lateral protrusion with tear at L4-5" (R. 21), in July 2004 a MRI revealed "no significant degenerative disc disease at levels above L5-S1 although there was some degree of facet joint hypertrophy at L4-5 causing very mild lateral recess stenosis" (R. 21-22), and an April 2007 x-ray and myelogram showed "no significant degenerative disc disease at L4-5," but did show "mild facet joint hypertrophy at L4-5" (R. 22).

Some of the post-DLI medical records detail Claimant's January 22, 2009 back surgery. (R. 603). After an October 2008 exam revealed "facet degenerative changes posterior fusion, right L4 PARS defect," Claimant underwent a transforaminal lumbar interbody fusion at L4-L5, in addition to decompression of the L4-L5 nerve roots. *Id.* Further, Claimant's treatment notes describe Claimant's "increasing tailbone pain, low back pain," which "have become worse in 2007." *Id.* Additionally, the treatment notes state that in 2007, Claimant had been seeing Dr. Foster, "who recommended pain management versus" additional surgery for Claimant's back pain. *Id.*

The post-DLI medical records describe Claimant's back problems–the same impairment that existed before Claimant's DLI. *See Johnson*, 434 F.3d at 656 (explaining that the ALJ is not required to consider evidence tending to show that a disability existed after the DLI where the objective medical evidence does not show that the impairment existed before claimant's DLI). As the post-DLI records show degenerative changes in the same area of Claimant's spine where he had two previous back surgeries, the medical records may demonstrate the severity of Claimant's

14

impairments during the relevant period. *Wooldridge*, 816 F.2d at 160. Even though this post-DLI medical evidence was in the record, the ALJ did not expressly consider or mention this evidence in the decision. (R. 14-31). As the ALJ failed to state why the post-DLI medical evidence was not considered, the court "cannot 'create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apaprent from the Commissioner's decision itself.'" *Newman v. Colvin*, No. 5:12-CV-739-BO, 2013 WL 6501165, at *2 (E.D.N.C. Dec. 11, 2013) (quoting *Grogan v. Barnhart*, 399 F.3d 1257, 1263 (10th Cir. 2005)). Nor may the court weigh this post-DLI evidence in the first instance. *Radford*, 734 F.3d at 296. Accordingly, the undersigned recommends that this case be remanded to the ALJ for consideration of the post-DLI medical evidence. Because the undersigned determines that remand on this issue will affect the remaining issue raised by Claimant, it does not address that argument.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-20] be ALLOWED, Defendant's Motion for Judgment on the Pleadings [DE-23] be DENIED and the case be REMANDED to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

Submitted, this the 12 day of January, 2015.

                                      Robert B. Jones, Jr.
                                      United States Magistrate Judge